**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOHAMMED MOSTAFA ALTAYAR, AKA Mohammed Mastafa Majid, *Petitioner*, | Nos. 17-73308 18-71754 |
| v. | Agency No. A212-377-363 |
| WILLIAM P. BARR, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 24, 2019
San Francisco, California

Filed January 14, 2020

Before: J. Clifford Wallace and Daniel A. Bress, Circuit
Judges, and Robert S. Lasnik,* District Judge.

Opinion by Judge Bress

---

* The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

**SUMMARY**[**]

**Immigration**

Denying Mohammed Mostafa Altayar's petition for review of a decision of the Board of Immigration Appeals, the panel held that his aggravated assault conviction under Arizona Revised Statutes ("A.R.S.") §§ 13-1203(A)(2) and 13-1204(A)(2) qualifies as a crime involving moral turpitude that made him removable.

Aggravated assault in Arizona arises from the interplay of two separate provisions, A.R.S. § 13-1203(A), which describes basic assault, and A.R.S. § 13-1204(A), which describes aggravated assault. The panel agreed that the parties' approach of treating both statutes as divisible comported with this court's case law and Arizona precedent.

Reviewing the judicially noticeable documents in the record, the panel concluded that Altayar had been convicted of aggravated assault under A.R.S. § 13-1203(A)(2), which contemplates intentionally placing another person in reasonable apprehension of imminent physical injury, and § 13-1204(A)(2), which provides that a person commits aggravated assault if the person uses a deadly weapon or dangerous instrument. The panel rejected Altayar's contention that the plea colloquy, in which his counsel used the word "reckless" in describing Altayar's misconduct, created ambiguity whether he was convicted under § 13-1203(A)(2), which has a means rea of "intentionally."

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Considering the charging the document, the plea agreement, and plea colloquy together, the panel concluded it that it was clear that Altayar had been convicted under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2).

Next, the panel turned to the question whether an aggravated assault conviction under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) is a crime involving moral turpitude. The panel noted that, under this court's cases, a crime involving moral turpitude is a crime that (1) is vile, base, or depraved and (2) violates accepted moral standards. The panel also observed that, under this court's precedents, the assault statutes that have been held to be crimes involving moral turpitude are those that include as an element some aggravating dimension sufficient to increase the culpability of an assault or battery and so to transform the offense into one categorically a crime involving moral turpitude.

The panel concluded that, consistent with this court's precedents and the BIA's longstanding decisions, the BIA could properly regard an aggravated assault with a deadly weapon or dangerous instrument as substantially more turpitudinous than a mere simple assault. The panel further explained that the intent element of A.R.S. § 13-1203(A)(2)—which requires intentionally placing another person in reasonable apprehension of imminent physical injury—is another factor supporting the BIA's categorization of Altayar's offense as a crime involving moral turpitude. Finally, the panel concluded that aggravated assault under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) involves serious contemplated harm, another factor that supports characterizing it as a crime involving moral turpitude. In this respect, the panel explained that the reasonable apprehension of imminent physical injury is not

merely of any injury, but a serious physical injury or even death. Accordingly, the panel held that aggravated assault under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) is a crime involving moral turpitude.

In a separate unpublished memorandum disposition, the panel denied Altayar's petitions for review as to the agency's determinations that he was ineligible for asylum and related relief, as well as the denial of his motion to reopen.

## COUNSEL

Benjamin T. Wiesinger (argued), Pope & Associates, PC, Phoenix, Arizona, for Petitioner.

Sabatino F. Leo (argued), Senior Litigation Counsel; Anthony P. Nicastro, Assistant Director; Joseph H. Hunt, Assistant Attorney General; United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, D.C.; for Respondent.

## OPINION

BRESS, Circuit Judge:

The question in this case is whether an Arizona aggravated assault conviction for "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury" while "us[ing] a deadly weapon or dangerous instrument," A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2), qualifies as "a crime involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(i), thus rendering an

alien deportable.  Consistent with our precedents, we hold that such a conviction so qualifies.

I.

Petitioner Mohammed Mostafa Altayar is an Iraqi citizen who was admitted to the United States as a refugee in 2011 and became a lawful permanent resident in 2012.  On April 13, 2014, Altayar was working at Sandy's Smoke Shop in the Phoenix area and standing out front with his friend and customer, Tracie Gomez.  Erick Villasenor walked by them and allegedly touched Gomez's buttocks.

Things quickly got out of hand.  Altayar called Villasenor a "faggot," and Villasenor then punched Altayar in the face.  Altayar drew a firearm and Villasenor fled. Altayar and his brother Mohannad chased Villasenor and caught him at a nearby Shell Gas station.  Video surveillance footage (which is no longer available) reportedly showed Altayar pointing his gun at Villasenor after Villasenor had been detained.  Villasenor also confirmed this to the police. Villasenor's brother and an acquaintance, who were both standing nearby, saw the commotion and ran to intervene, but Altayar waved his gun at both men, who then backed away with their hands up.  Before long, the smoke shop's security guard arrived at the parking lot and placed Villasenor in handcuffs, believing Villasenor had robbed the store.  Once Villasenor was restrained, Altayar holstered his firearm and kicked Villasenor in the head.  Police responded to the scene, questioned witnesses, reviewed footage from the gas station's security cameras, and placed Altayar under arrest.

Altayar was charged in Arizona state court with four counts of aggravated assault and one count of disorderly conduct.  "Count 1" charged Altayar with "Aggravated

Assault, A Class 3 Dangerous Felony." Count 1 alleged that Altayar, "on or about the 13th day of April, 2014, using a handgun, a deadly weapon or dangerous instrument, intentionally placed ERICK VILLASENOR in reasonable apprehension of imminent physical injury, in violation of A.R.S. §§ 13-1203, 13-1204, 13-3105, 13-701, 13-702, and 13-801."

Altayar pleaded guilty to Count 1. In exchange, the prosecution agreed to dismiss "Counts 2–5, and the allegation that Count 1 was a dangerous offense for sentence enhancement purposes." At the plea colloquy, Altayar through counsel confirmed that Altayar had drawn his gun "after there was no further issue as to danger for himself," and that "there was no issue in terms of self-defense because the danger had ceased to exist the moment he withdrew the weapon."

Altayar's plea and sentence were formally entered on March 6, 2015. As a first-time offender, he faced a sentencing range of 2 – 8.75 years in prison and a presumptive sentence of 3.5 years. *See* A.R.S. § 13-702(D). Altayar's presentence investigation report concluded that Altayar "escalated matters when he pulled out a handgun" and "waved and pointed the gun" at Villasenor. While this was Altayar's first criminal conviction, the presentence report found the conviction was "quite serious in nature as it involved a weapon and a victim." The court sentenced Altayar to 48 hours in jail along with five years of probation and ordered payment of restitution, a fine, and fees.

Shortly after Altayar pleaded guilty, the Department of Homeland Security (DHS) initiated removal proceedings against him. Citing his aggravated assault conviction, DHS alleged that Altayar was removable under 8 U.S.C. § 1227(a)(2)(A)(i) for being convicted of a crime involving

moral turpitude punishable by a sentence of one year or more that was committed within five years after admission. Altayar admitted his conviction but denied removability. Altayar also applied for asylum, withholding of removal, and protection from removal under the Convention Against Torture.

As relevant here, the Immigration Judge (IJ) determined that Altayar's conviction qualified as a crime involving moral turpitude (sometimes referred to as a "CIMT"). The Board of Immigration Appeals (BIA) dismissed Altayar's appeal. The BIA concluded that the charging documents and plea agreement confirmed that Altayar was convicted of "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury" while "us[ing] a deadly weapon or dangerous instrument," in violation of A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2). In the BIA's view, such a conviction qualified as a crime involving moral turpitude because it "require[d] both proof of an aggravating factor (here, the use of a deadly weapon) and a culpable state of mind." In the alternative, the BIA held that Altayar's crime would involve moral turpitude even if the statute of conviction had only required a mens rea of recklessness. Altayar now petitions for review.[1]

---

[1] The IJ further found that Altayar had committed a "particularly serious crime," thereby rendering him ineligible for asylum and withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). The IJ also denied deferral of removal under the Convention Against Torture. The BIA agreed as to both issues. Altayar later filed a motion to reopen in the BIA, which the BIA denied. We address these issues in a separate unpublished memorandum disposition, where we deny the petitions for review as to those issues.

## II.

## A.

An alien is deportable if he (1) "is convicted of a crime involving moral turpitude committed within five years . . . after the date of admission" and (2) "is convicted of a crime for which a sentence of one year or longer may be imposed." 8 U.S.C. § 1227(a)(2)(A)(i). The only requirement that Altayar challenges is whether his Arizona aggravated assault conviction is a "crime involving moral turpitude." We have jurisdiction to address this purely legal question. *See* 8 U.S.C. § 1252(a)(2)(D); *Leal v. Holder*, 771 F.3d 1140, 1144 (9th Cir. 2014).

To answer it, we apply the so-called "categorical" and "modified categorical approaches," which require determining whether the elements of the offense of conviction (as opposed to the facts underlying the conviction) constitute a crime involving moral turpitude. *See, e.g.*, *Mendoza v. Holder*, 623 F.3d 1299, 1302 (9th Cir. 2010); *Marmolejo–Campos v. Holder*, 558 F.3d 903, 912 (9th Cir. 2009) (en banc). Under the categorical approach, "we ask whether the full range of conduct encompassed by the criminal statute constitutes a crime of moral turpitude." *Lozano-Arredondo v. Sessions*, 866 F.3d 1082, 1086 (9th Cir. 2017) (quotations omitted). The modified categorical approach, by comparison, requires examination of those elements encompassed within the specific statutory provision that formed the basis for the conviction. *Id.* We apply the modified categorical approach "only if the statute is divisible," *id.*, which is to say that the statute contains multiple, alternative sets of elements that define multiple, distinct crimes. *See Mathis v. United States*, 136 S. Ct. 2243, 2248–49 (2016). At that point, we "consult a limited class of documents . . . to determine which alternative formed the

basis of the [petitioner's] prior conviction." *Descamps v. United States*, 570 U.S. 254, 257 (2010). When, as here, the conviction is based on a guilty plea, we may examine the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005); *United States v. Cabrera-Perez*, 751 F.3d 1000, 1005 n.4 (9th Cir. 2014) (same).[2]

## B.

Aggravated assault in Arizona arises from the interplay of two separate provisions, A.R.S. §§ 13-1203(A) and 13-1204(A). Under A.R.S. § 13-1203(A), Arizona's basic assault provision, "[a] person commits assault by":

1. Intentionally, knowingly or recklessly causing any physical injury to another person; or

2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or

3. Knowingly touching another person with the intent to injure, insult or provoke such person.

A.R.S. § 13-1203(A). Under § 13-1204(A), "[a] person commits aggravated assault if the person commits assault as

---

[2] We must reject Altayar's request that we abandon the categorical and modified approaches altogether and consider the underlying facts giving rise to his conviction. Circuit precedent forecloses that argument. *See, e.g.*, *Mendoza*, 623 F.3d at 1302.

prescribed by § 13-1203 under" eleven separately numbered circumstances. One of these, which is relevant here, is "[i]f the person uses a deadly weapon or dangerous instrument." A.R.S. § 13-1204(A)(2).

The parties have treated both the basic and aggravated assault provisions as divisible. That approach comports with our case law and Arizona precedent. *See United States v. Sahagun-Gallegos*, 782 F.3d 1094, 1098 & n.3 (9th Cir. 2015) (treating A.R.S. § 13-1203(A) as divisible in determining if conviction constituted a "crime of violence" under the Sentencing Guidelines, and noting that "Arizona treats the subsections of A.R.S. § 13-1203(A) as three different crimes, each comprised of different elements"); *Cabrera-Perez*, 751 F.3d at 1004–05 (same for purposes of "crime of violence" provision in Immigration and Nationality Act). Because each subsection of § 13-1203(A) carries different punishments, *see* A.R.S. §§ 13-1203(B), 13-707(A), "then under *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] they must be elements," *Mathis*, 136 S. Ct. at 2256. The same is true for § 13-1204(A), which contains eleven subsections that trigger differing punishments depending upon the aggravating circumstance. A.R.S. § 13-1204(E)–(G); A.R.S. § 13-702.

The judicially noticeable documents in the record establish beyond question that Altayar was convicted of aggravated assault under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2). Altayar concedes the latter, but disputes the former. He is mistaken. As we explained above, Altayar's charging document in Count 1 used language that directly tracked the language of A.R.S. § 13-1203(A)(2), and Altayar pleaded guilty to Count 1. We have applied the modified categorical approach in like circumstances to hold that

A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) formed the statute of conviction. *See Cabrera-Perez*, 751 F.3d at 1006.

Altayar tries to inject uncertainty into this analysis by seizing upon two instances in the plea colloquy during which his counsel used the word "reckless" or "recklessly" in describing Altayar's misconduct. According to Altayar, this creates ambiguity whether Altayar was convicted under § 13-1203(A)(2), which has a mens rea of "intentionally." That argument fails. Like the charging document, Altayar's counsel at various points in the colloquy described Altayar's offense in language that mirrors the statutory language of § 13-1203(A)(2). In light of the factual basis confirmed during the plea hearing, Altayar's plea under the statute shows that he "necessarily admitted" the elements therein, *Shepard*, 544 U.S. at 26, including that the offense was done "intentionally." Considering the charging document, plea agreement, and plea colloquy together, it is clear Altayar was convicted under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2).

## C.

### 1.

We now turn to the question whether an aggravated assault conviction under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) is a crime involving moral turpitude, examining the statute of conviction and not Altayar's underlying conduct. *See Hernandez-Cruz v. Holder*, 651 F.3d 1094, 1110 (9th Cir. 2011).

To begin, we determine *de novo* the elements of the statute of conviction. *See, e.g.*, *Leal*, 771 F.3d at 1144. We then compare those elements "to the generic definition of a crime of moral turpitude and decide whether the conviction

meets that definition." *Ceron v. Holder*, 747 F.3d 773, 778 (9th Cir. 2014) (en banc) (quotations omitted). The objective is to determine "whether the conduct proscribed in the statute is broader than, and so does not categorically fall within," the definition of a crime involving moral turpitude. *Leal*, 771 F.3d at 1145 (quotations omitted).

Under our cases, "'a crime involving moral turpitude is generally a crime that (1) is vile, base, or depraved and (2) violates accepted moral standards.'" *Ceron*, 747 F.3d at 779 (quoting *Latter-Singh v. Holder*, 668 F.3d 1156, 1161 (9th Cir. 2012)). The BIA can receive deference in its determination that an offense qualifies as a crime involving moral turpitude. *See, e.g.*, *id.* at 785. Where, as here, the BIA's decision "is unpublished (and not directly controlled by any published decision interpreting the same statute)," *Uppal v. Holder*, 605 F.3d 712, 714 (9th Cir. 2010), we apply the *Skidmore* framework, under which "the measure of deference afforded to the agency varies 'depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Marmolejo–Campos*, 558 F.3d at 909 (alteration in original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In this case, the BIA's decision, though unpublished, is a reasoned one that derives its conclusion from our prior decisions and prior BIA decisions. It is therefore entitled to some measure of deference. *See, e.g.*, *Latter-Singh*, 668 F.3d at 1160.

2.

The starting point for evaluating the BIA's decision is our own decision in *Fernandez-Ruiz v. Gonzales*, 468 F.3d 1159, 1164–68 (9th Cir. 2006), in which we held that A.R.S. § 13-1203(A)—Arizona's base assault provision—did not

categorically qualify as a crime involving moral turpitude. Our holding there reflected the well-accepted proposition that "a conviction for simple assault does not involve moral turpitude." *Id.* at 1165; *see also Uppal*, 605 F.3d at 716 (same); *In re Wu*, 27 I. & N. Dec. 8, 10–11 (BIA 2017) ("It is well established that a simple assault or battery that only requires offensive touching or threatened offensive touching of another committed with general intent that does not result in serious bodily harm is not considered to involve moral turpitude.").

*Fernandez-Ruiz* did not involve an aggravated assault under A.R.S. § 13-1204(A)(2), or any other aggravating circumstance. *See* 468 F.3d at 1167 n.8. Nor did *Fernandez-Ruiz* involve a conviction under § 13-1203(A)(2) in particular: the administrative record there did not allow us to apply the modified categorical approach because it was unclear which subsection of § 13-1203(A) supported the conviction. *Id.* at 1164–68. *Fernandez-Ruiz* therefore did not consider the question presented here, namely, whether an aggravated assault under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) is a crime involving moral turpitude.

Under our precedents in this area, an aggravated assault presents a very different situation than mere simple assault. As we have explained, "[s]ome assault statutes . . . have been held to be CIMTs. Those statutes include as an element 'some aggravating dimension' sufficient to increase the culpability of an assault or battery and so to transform the offense into one categorically a CIMT." *Uppal*, 605 F.3d at 717 (citing various BIA decisions); *see also Leal*, 771 F.3d at 1148; *Latter-Singh*, 668 F.3d at 1161. As a result, "to rise to the level of moral turpitude, an assault crime must involve a particular type of aggravating factor, one that says

something about the turpitude or blameworthiness inherent in the action." *Uppal*, 605 F.3d at 717.

The BIA here relied on the fact that Altayar's conviction involved the aggravating circumstance that he "use[d] a deadly weapon or dangerous instrument." A.R.S. § 13-1204(A)(2). Arizona law defines "[d]eadly weapon" as "anything designed for lethal use, including a firearm." A.R.S. § 13-105(15). A "[d]angerous instrument," meanwhile, is "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." A.R.S. § 13-105(12). These definitions underscore that the aggravating circumstance in A.R.S. § 13-1204(A)(2) is a quite serious one involving a weapon or instrument capable of producing serious harm or even mortal injury.

The BIA determined that the aggravating circumstance of using a deadly weapon or dangerous instrument supported categorizing Altayar's offense as one involving moral turpitude. That determination finds ample support in the BIA's own longstanding decisions, *see, e.g.*, *Wu*, 27 I. & N. Dec. at 11–12; *In re Sanudo*, 23 I. & N. Dec. 968, 971 (BIA 2006); *In re Medina*, 15 I. & N. Dec. 611, 614 (BIA 1976), as well as our own. Indeed, in *Uppal*, we specifically noted that an "'aggravating dimension[]'" that has been "recognized as sufficiently increasing the culpability of an assault to turn an assault into a CIMT *ha[s] been the use of a deadly weapon*." 605 F.3d at 717 (emphasis added) (citing *Medina*, 15 I. & N. Dec. at 614). In *Ceron*, our en banc Court similarly explained that "[t]he presence of an aggravating factor, such as . . . the use of a deadly weapon, can be important in determining whether a particular assault amounts to a crime involving moral turpitude." 747 F.3d at 783 (quotations omitted).

These observations are readily understandable: the use in an assault of a "deadly weapon" (or a "dangerous instrument" that "is readily capable of causing death or serious physical injury," A.R.S. § 13-105(12)) necessarily makes the offense more serious, more dangerous, and therefore more blameworthy than a simple assault. *See Uppal*, 605 F.3d at 717. Such an aggravating circumstance is directly reflective of "'the character, gravity, and moral significance of the conduct.'" *Latter-Singh*, 668 F.3d at 1159 (quoting *Marmolejo-Campos*, 558 F.3d at 910); *see also Wu*, 27 I. & N. Dec. at 11 (BIA concluding that the aggravating factor of use of a deadly or dangerous weapon or instrument "magnifies the danger posed by the perpetrator and demonstrates his or her heightened propensity for violence and indifference to human life"). Consistent with our own precedents, *see Ceron*, 747 F.3d at 783; *Uppal*, 605 F.3d at 717, the BIA could properly regard an aggravated assault with a deadly weapon or dangerous instrument as substantially more turpitudinous than a mere simple assault.

The intent element of A.R.S. § 13-1203(A)(2)—which requires "*[i]ntentionally* placing another person in reasonable apprehension of imminent physical injury" (emphasis added)—is another factor supporting the BIA's categorization of Altayar's offense as a crime involving moral turpitude. The BIA relied upon this factor, and its reliance was well-placed. We have explained that "intent is a crucial element in determining whether a crime involves moral turpitude." *Ceron*, 747 F.3d at 781 (quotations omitted). And citing the BIA's "previous opinions in which it found that intentionally threatening behavior indicated a crime involving moral turpitude," we have held that "[t]he BIA is entitled to place great weight on the presence or absence of a *mens rea* element when determining whether a

crime involves moral turpitude." *Latter-Singh*, 668 F.3d at 1162.

In this case, "intentionally" is defined as "with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). Arizona law requires that this heightened mens rea applies to each element of the offense. *See* A.R.S. § 13-202(A) ("If a statute defining an offense prescribes a culpable mental state that is sufficient for commission of the offense without distinguishing among the elements of such offense, the prescribed mental state shall apply to each such element unless a contrary legislative purpose plainly appears."). In the context of an aggravated assault conviction under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2), a defendant must therefore intend to use the deadly weapon or dangerous instrument and must, through the use of that weapon or instrument, "intend[] to place another person in reasonable apprehension of imminent physical injury." *State v. Salman*, 897 P.2d 661, 664 (Ariz. Ct. App. 1994) (citing *In re Pima Cty. Juvenile Action*, 693 P.2d 909, 911 (Ariz. 1984)). The heightened *mens rea* of "intentional[]" wrongdoing in A.R.S. § 13-1203(A)(2) adds to the moral blameworthiness of Altayar's offense and supports the BIA's determination that Altayar's conviction is a crime involving moral turpitude.[3]

---

[3] Because it is clear under the modified categorical approach that Altayar was convicted under a subsection requiring intentional misconduct and not reckless misconduct, we have no occasion to consider the BIA's alternative holding that a reckless aggravated assault with a deadly weapon or dangerous instrument would also qualify as a crime involving moral turpitude. Our opinion should not be read to suggest that an aggravated assault offense must necessarily contain a

Finally, aggravated assault under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) involves serious contemplated harm, another factor that supports characterizing it as a crime involving moral turpitude. In *Fernandez-Ruiz*, we relied on the fact that A.R.S. § 13-1203(A)(2), standing alone, "contains absolutely no element of injury whatsoever, as it prohibits conduct that merely places another person 'in reasonable apprehension of' physical injury." 468 F.3d at 1167. But as stated above, *Fernandez-Ruiz* did not consider an aggravated assault with a deadly weapon or dangerous instrument. And later cases have clarified that in some circumstances, offenses that do not result in physical harm can still qualify as crimes involving moral turpitude.

For example, in *Latter-Singh*, we held that a conviction under California Penal Code § 422 qualified as a crime involving moral turpitude, where the statute criminalized "'willfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat.'" 668 F.3d at 1156 (ellipsis in original) (quoting Cal. Penal Code § 422). We explained that "the underlying conduct threatened"—"death or great bodily injury"—"is itself a crime of moral turpitude." *Id.* at 1161. That, we held, "was not true of the statute in *Fernandez-Ruiz*, which involved a simple assault." *Id.*; *see also Coquico v. Lynch*, 789 F.3d 1049, 1054 (9th Cir. 2015) ("[T]he threat in *Latter-Singh* had to be of 'death or great bodily injury,' which was not the case in *Fernandez-Ruiz* . . . .") (quotations omitted).

---

mens rea requirement greater than recklessness in order to qualify as a crime involving moral turpitude. We do not reach that issue.

Several years later in *Leal*, we similarly held that Arizona's felony endangerment statute, A.R.S. § 13-1201, qualified as a crime involving moral turpitude because it "require[d] the perpetrator to endanger another person recklessly with a substantial risk of imminent death." 771 F.3d at 1145–46. In *Leal*, we therefore "agree[d] with the BIA's determination that the creation of a substantial, actual risk of imminent death is sufficiently reprehensible, or in terms of our case law, 'base, vile, and depraved,' to establish a CIMT, even though no actual harm need occur." *Id.* at 1146.

More recently, in *Fugow*, we held that first-degree imprisonment under Hawaii law was a crime involving moral turpitude. *Fugow v. Barr*, 943 F.3d 456, 459 (9th Cir. 2019) (per curiam). The statute at issue there criminalized "knowingly restrain[ing] another person under circumstances which expose the person to the risk of serious bodily injury." *Id.* at 458 (alteration in original) (quoting Haw. Rev. Stat. § 707-721(1)). Relying on *Leal*, we reiterated that actual injury was not invariably a requirement for crimes involving moral turpitude, and that it was sufficient, in combination with the Hawaii statute's heightened mens rea, that the misconduct "expose[s] the [victim] to a risk of serious bodily injury." *Id.* at 459.

The contemplated bodily harm associated with conduct punishable under A.R.S. §§ 13-1203(A)(2) and § 13-1204(A)(2) fits comfortably within these above-described precedents. While A.R.S. § 13-1203(A)(2) standing alone requires only "reasonable apprehension of imminent physical injury," without more, the aggravating circumstance in § 13-1204(A)(2) requires the use of "a deadly weapon or dangerous instrument." And as we explained above, Arizona law defines "[d]eadly weapon" as

"anything designed for lethal use, including a firearm," A.R.S. § 13-105(15), and a "[d]angerous instrument" as "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury," A.R.S. § 13-105(12). The "reasonable apprehension of imminent physical injury," A.R.S. § 13-1203(A)(2), is thus not merely of any injury, but a serious physical injury or even death. *See* A.R.S. §§ 13-1204(A)(2), 13-105(12) & (15). In that situation, "the underlying conduct threatened is itself a crime of moral turpitude." *Latter-Singh*, 668 F.3d at 1161.

There are, to be sure, some differences between the Arizona offense at issue here and the offenses at issue in these other cases. For example, the contemplated harm in *Leal* was death, 771 F.3d at 1144, whereas the contemplated harm here is death or serious physical injury. But that was true in *Fugow* as well. *See Fugow*, 943 F.3d at 459 (holding that "the lesser harm contemplated by the Hawaii statute . . . is less severe than the harm contemplated by the Arizona statute" in *Leal*, but that "the harm required by the Hawaii statute is still severe"). It was also the case in *Latter-Singh*. *See* 668 F.3d at 1161. Another difference is that *Latter-Singh* involved the "requirement that the person threatened be in *sustained* fear of immediate danger to his or his family's *safety*," *id.* at 1162, whereas the Arizona aggravated assault offense in this case does not require such a "sustained" fear component.

But there are other differences among the statutes indicating that, in certain respects, the Arizona offense at issue here reflects greater moral turpitude. *Leal*, for example, proscribed only reckless conduct, *see* 771 F.3d at 1146, whereas the statute of conviction here proscribes intentional conduct. *See also Fugow*, 943 F.3d at 459

(making a similar point).  In *Latter-Singh*, the offense did not even involve conduct, but rather speech.  *See* 668 F.3d at 1162.  And none of the other cases involved the most turpitudinous feature of this case, which is the required use of a deadly weapon or dangerous instrument.  *See, e.g.*, *Uppal*, 605 F.3d at 717.

That statutes with such differences all qualify under our precedents as crimes involving moral turpitude speaks to the basic point that in order to so qualify, a greater required showing in one aspect of the criminal offense can accommodate a lesser required showing in another.  As we have held, "'as the level of conscious behavior decreases, *i.e.*, from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude.'"  *Leal*, 771 F.3d at 1146 (quoting *Ceron*, 747 F.3d at 783).  By that logic, "[i]t follows that a crime committed knowingly or intentionally needs less serious harm to qualify as a CIMT than a crime committed recklessly."  *Fugow*, 943 F.3d at 458.  We are satisfied that under our cases, an aggravated assault conviction under A.R.S. §§ 13-1203(A)(2) and 13-1204(A)(2) involving the use of a deadly weapon or dangerous instrument qualifies as a crime involving moral turpitude.

\*        \*        \*

For the foregoing reasons and those set forth in our accompanying memorandum disposition, Altayar's petitions for review are **DENIED.**